648 S.E.2d 31

**STATE of West Virginia ex rel. ERIE INSURANCE PROPERTY & CASUALTY COMPANY, Defendant Below, Petitioner,**

v.

**The Honorable James P. MAZZONE, Judge of the Circuit Court of Ohio County, and Elizabeth Murfitt, Plaintiff Below, Respondents.**

No. 33209.

Supreme Court of Appeals of West Virginia.

Submitted: Jan. 23, 2007.

Decided: June 7, 2007.

Concurring Opinion of Justice Starcher June 29, 2007.

Concurring Opinion of Justice Benjamin July 25, 2007.

---

**8.** The West Virginia Division of Motor Vehicles filed an amicus curiae brief in connection with this case.

Robert J. Behling, Robert E. Dapper, Jr., Christopher M. Jacobs, Dapper, Baldasare, Benson, Behling & Kane, Pittsburgh, PA, for the Petitioner.

Christopher J. Regan, James G. Bordas, III, Bordas & Bordas, PLLC, Wheeling, for the Respondent, Elizabeth Murfitt.

ALBRIGHT, Justice.

For a second time in the underlying third-party bad faith action, Erie Insurance Property & Casualty Company (hereinafter referred to as "Erie") invokes the original jurisdiction of this Court [1] in order to obtain a writ of prohibition to bar the enforcement of a discovery order of the Ohio County Circuit Court requiring disclosure of relevant reserves information to the plaintiff below, Elizabeth Murfitt. This Court had granted Erie's earlier request to prohibit the enforcement of a March 30, 2005, order regarding the reserves information. *State ex rel. Erie Ins. Prop. & Cas. Co. v. Mazzone*, 218 W.Va. 593, 625 S.E.2d 355 (2005) (hereinafter referred to as "*Erie I*"). While Erie had asserted in *Erie I* that the reserves information was protected from disclosure as opinion work product, we did not reach the work product argument and instead granted the writ based on the more fundamental problem that the threshold inquiry regarding relevancy had not been completed by the lower court. *See id.* at Syl. Pt. 4. Erie renews its opinion work product argument in the request now before this Court to prohibit the enforcement of the lower court's June 29, 2006, order, which again requires disclosure of the reserves information. For the reasons explained below, the relief in prohibition is denied.

## I. Factual and Procedural Background

The original negligence claim in this case was brought by Ms. Murfitt against a driver whose automobile insurer was Erie. During the course of the jury trial on the negligence action, the parties settled the claim. Ms. Murfitt then filed an amended complaint al-

leging that the manner in which Erie had handled her claim evidenced bad faith.[2]

When Erie objected to discovery requests of Ms. Murfitt, including documents containing Erie's reserves information regarding the claim, Ms. Murfitt filed a motion to compel discovery. The ruling on the motion took the form of a lower court order dated March 30, 2005. In that order the court below directed that "any documents pertaining to 'reserves' are to be disclosed to the extent of reserve amounts and dates on which any such amounts were placed." The March 30, 2005, order was the object of our attention in *Erie I*.

Following our decision in *Erie I*, the lower court held a hearing on May 12, 2006, to address Ms. Murfitt's Renewed Motion to Compel Production of Reserve Information. After hearing oral argument, the trial court, adhering to the direction provided in *Erie I*, determined that the reserves information is relevant to Ms. Murfitt's claim that Erie intentionally undervalued her claim in its settlement offers.[3] Thereafter, the lower court reaffirmed its previous determination that the reserves information was not excluded from discovery under the principles of the work product doctrine. As indicated in the Memorandum Opinion and Order dated June 29, 2006, the lower court found the doctrine inapplicable because only the raw data regarding the reserves amounts and the dates those amounts were calculated were being ordered disclosed rather than the reasoning and thought process behind the reserves numbers. Additionally, the lower court in its June 29, 2006, order found that "anticipation of litigation is not the primary motivating purpose for establishing insurance reserves...." The court below alternatively found that disclosure was appropriate even if the reserves information was work product because Ms. Murfitt had established the requisite level of need.

---

1. *See* W.Va. Const. article VIII, § 3; W.Va.Code §§ 51–1–3, 53–1–1 to –11 (Repl.Vol.2000).

2. The original defendant was subsequently dismissed from the lawsuit.

3. No objection has been raised in this proceeding regarding the relevancy determination.

On August 14, 2006, Erie petitioned this Court for a writ of prohibition to bar enforcement of the June 29, 2006, order. The petition asserts that by again issuing the discovery order the lower court exceeded its legitimate powers and abused its discretion because the material ordered to be produced is opinion work product, which Erie contends should be treated as privileged material that Erie maintains should rarely, if ever, be subject to disclosure. After finding a prima facie case had been established, on October 26, 2006, this Court issued a rule against the circuit judge and Ms. Murfitt as respondents to show cause why the writ prayed for should not be awarded. W.Va.Code § 53–1–5 (1933) (Repl.Vol.2000).

## II. Standard of Review

■ The requested extraordinary relief is sought to stop the enforcement of an order directing release of information at the discovery phase of a civil proceeding. As we held in syllabus point three of *State ex rel. United States Fidelity & Guaranty Co. v. Canady,* 194 W.Va. 431, 460 S.E.2d 677 (1995), "[w]hen a discovery order involves the probable invasion of confidential materials that are exempted from discovery under Rule 26(b)(1) and (3) of the West Virginia Rules of Civil Procedure, the exercise of this Court's original jurisdiction is appropriate."

■ As a general rule,

[a] circuit court's ruling on discovery requests is reviewed for an abuse of discretion standard; but, where a circuit court's ruling turns on a misinterpretation of the West Virginia Rules of Civil Procedure, our review is plenary. The discretion that is normally given to a trial court's procedural decisions does not apply where the trial court makes no findings or applies the wrong legal standard.

Syl. Pt. 5, *State ex rel. Medical Assurance of West Virginia v. Recht,* 213 W.Va. 457, 583 S.E.2d 80 (2003). Furthermore, when presented with a challenge to the compelled disclosure of materials alleged to be privileged, we conduct "a hard and more stringent examination" of whether the circuit court abused its discretion. Syl. Pt. 5, *Canady,* 194 W.Va. at 433, 460 S.E.2d at 679..

## III. Discussion

Erie urges us to find that the lower court erred as a matter of law when it ordered disclosure of the subject reserves information because it maintains that the information is protected from discovery pursuant to Rule 26(b)(3) of the West Virginia Rules of Civil Procedure as opinion work product that was prepared in the context of anticipated or existing litigation. With like force Ms. Murfitt urges us to uphold the ruling because it neither demonstrates improper application of the law nor an abuse of discretion by the court below. Ms. Murfitt specifically maintains that Erie failed to substantiate its claim that the reserves information was protected from disclosure under the work product doctrine because the primary motivating purpose for creating the reserves information was not "in anticipation of litigation or for trial." W. Va. R. Civ. P. 26(b)(3).

In reaching its conclusion that the reserves information is subject to discovery, the lower court made the following relevant findings, as manifested in the June 29 order:

The Court FINDS and CONCLUDES that the raw data indicating the reserve amounts and the dates said reserve amounts were placed on the claim are not privileged. However, the reasoning and the thought process behind the reserve numbers are privileged as work product. . . .

The facts of this case indicate that anticipation of litigation is not the primary motivating purpose for establishing insurance reserves, as insurance companies are required by law to establish reserves. Every claim presumably has some reserve amount attached to it, regardless of whether the claim ends in litigation or is resolved through other means. During her deposition on February 16, 2006, claims supervisor Sandra Barker testified that a reserve is "an amount of money or a dollar amount that's set aside for payment of an injury claim or any type of claim of [sic] any payment upon any claim." Mrs. Barker's description of reserves supports the Court's conclusion that the potential for litigation is not the primary motivating

purpose for setting reserves, as they are set aside for "any type of claim" and for "any payment upon any claim," not limited to those claims for which litigation is likely or anticipated.

Also significant is Erie's disclosure that Erie employees, and not attorneys are involved in setting the reserve amounts. In its answer to Plaintiff's First Set of Interrogatories, Erie identified four individuals as being those that "participated in the decisions regarding the setting of reserves in connection with the claim brought by Elizabeth Murfitt." ... In Erie's responses to Plaintiff's First Set of Interrogatories, each of ... [the named] individuals is identified as either an agent, representative and/or employee of Erie that had involvement in Mrs. Murfitt's claim.

The Court's decision is limited to the facts of the case before it and it is not deciding that insurance reserve information is discoverable in every case as a general matter. The Court is persuaded that the reserve amounts ordered produced are relevant to the Plaintiff's claims, particularly in light of the Defendant's admission that the reserve amounts in this case were driven by the specific facts of the underlying claim. Pursuant to Rule 26(b)(3) of the West Virginia Rules of Civil Procedure, the Court additionally FINDS that the party seeking discovery has a substantial need of the materials and that the party is unable to obtain the equivalent of the materials by other means. (Citation and footnote omitted.)

A fair summary of the lower court's ruling then is that the subject reserves information is discoverable for two reasons: (1) the reserves amounts and the dates on which the amounts were set are not work-product be-cause they were not set in anticipation of litigation, and (2) if the reserves information is subject to Rule 26(b)(3) as work-product, substantial need and inability to obtain the material elsewhere were demonstrated by Appellant.

In order to determine the propriety of the lower court's rulings, we initially examine the work-product doctrine as set forth in Rule 26(b)(3) of the West Virginia Rules of Civil procedure (hereinafter referred to as "Rule 26(b)(3)") [4], with particular consideration to the distinction between fact and opinion work product under the rule and whether and under what circumstances other courts have treated reserves information as opinion work product for discovery purposes.

We recognized in *State ex rel. United Hospital Center, Inc. v. Bedell*, 199 W.Va. 316, 327, 484 S.E.2d 199, 210 (1997), that the work product doctrine has its roots in the United States Supreme Court decision of *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), predating the adoption of Rule 26(b)(3). The underlying purpose for the protection afforded by the doctrine as explained in *Hickman*, serves as guidance in our examination of the issue now pending:

> Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.
>
> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, ... it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's

4. The relevant portion of Rule 26(b)(3) of the Rules of Civil Procedure states:

(3) Trial preparation: materials.—Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or other legal theories of an attorney or other representative of a party concerning the litigation.

case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed ... as the "work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own.

*Id.* at 510–11, 67 S.Ct. 385. However, the Court in *Hickman* made clear that the work-product doctrine provides qualified and not absolute immunity from disclosure. "[A]ll written materials obtained or prepared by an adversary's counsel with an eye toward litigation are [not] necessarily free from discovery in all cases. Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had." *Id.* at 511, 67 S.Ct. 385. Following this direction, we held in syllabus point seven of *State ex rel. United Hospital Center, Inc. v. Bedell,* that in order "[t]o determine whether a document was prepared in anticipation of litigation and, is therefore, protected from disclosure under the work product doctrine, the primary motivating purpose behind the creation of the document must have been to assist in pending or probable future litigation." 199 W.Va. at 320, 484 S.E.2d at 203. Because the preparers of the reserves information in the instant case were non-lawyers, we further note that Rule 26(b)(3) extends work product protection to materials prepared by non-lawyers when the paramount purpose for generating the materials is litigation. As explained by the United States Supreme Court in *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975):

At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id.* at 238–39, 95 S.Ct. 2160 (footnote omitted). This Court has likewise concluded that "[t]he purpose of Rule 26(b)(3) is to narrow the ability to obtain trial preparation material by expanding the coverage of the work product rule to include persons other than an attorney." Syl. Pt. 6, in part, *In re Markle,* 174 W.Va. 550, 328 S.E.2d 157 (1984). While authority to invoke the protection of the work product doctrine generally rests exclusively with attorneys, we decided in *State ex rel. Allstate Insurance Co. v. Gaughan,* 203 W.Va. 358, 508 S.E.2d 75 (1998), that insurers defending third party bad-faith claims may invoke work product protection of certain information in claims files. Insurers may raise the work product rule "where an insured has signed a release of his/her claim file to a third-party litigant ... [and] documents in the insured's claim file that were generated prior to the filing date of a third-party's complaint" are sought to be discovered. *Id.* at Syl. Pt. 11.

■ The work product doctrine provides a qualified immunity to two categories of work products: fact and opinion. *See In re Markle,* 174 W.Va. at 556–57, 328 S.E.2d at 163. Pursuant to the applicable provisions of Rule 26, fact work product includes any documents or tangible things prepared by a party, or a party's representative, in anticipation of litigation. Opinion work product encompasses those documents or tangible materials which contain "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative... concerning the litigation." W.Va. R. Civ. P. 26(b)(3).

■ We observed in syllabus point seven of *In re Markle* that provisions of Rule 26(b)(3) distinguish the level of necessity that must be demonstrated in order to obtain discovery of factual work product versus opinion work product. We then elaborated on the distinction by stating:

> Where factual work product is involved, the party demanding production must show "a substantial need" for the material and that he cannot obtain the same or its equivalent through other means "without undue hardship." Where opinion work product is involved, the showing required to obtain discovery is even stronger since the rule states that "the court shall protect against disclosure of mental impressions, conclusions, opinions or legal theories." Rule 26(b)(3).

174 W.Va. at 556–57, 328 S.E.2d at 163 (footnotes omitted). We further observed in *State ex rel. Brison v. Kaufman*, 213 W.Va. 624, 633, 584 S.E.2d 480, 489 (2003), that "[a]s between the two, opinion work product is more scrupulously protected." *See also State ex rel. Med. Assurance of West Virginia, Inc. v. Recht*, 213 W.Va. at 467, 583 S.E.2d at 90 (identifying cases in which the heightened protection of opinion work product is acknowledged); John F. Wagner, Jr., *Protection from Discovery of Attorney's Opinion Work Product under Rule 26(b)(3), Federal Rules of Civil Procedure*, 84 A.L.R. Fed. 779 (1987).[5]

Erie asserts that the lower court erred by applying the more relaxed *fact* work product standard to the reserves information, which Erie maintains should in all relevant instances be subject to review as *opinion* work product. If indeed the material at issue is opinion work product, we agree that the lower court erred in applying the fact work product standards. Our task now turns to the yet unanswered question in this jurisdiction of when reserves information is considered opinion work product.

■ We find no authority to support Erie's implication that reserves information is generally treated as opinion work product. Rather, courts addressing this issue have undertaken a more close analysis of the circumstances under which the information is gathered and the nature, if any, of attorney as well as non-lawyer representative involvement in the collection process. Two federal cases [6] with focused discussions on when reserves information falls within the boundaries of opinion work product are particularly instructive: *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir.1987), and *Rhone–Poulenc Rorer, Inc. v. Home Indemnity Company*, 139 F.R.D. 609 (E.D.Pa.1991).[7] We acknowledge that neither case involved a third-party bad faith action or an insurer's right to invoke the work product rule, but nonetheless find the reasoning of these courts helpful in dealing with the issue of insurance reserves as opinion work product.

---

**5.** Although this Court has not *comprehensively* addressed what conditions would overcome the greater protection afforded opinion work product, there are two general exceptions which have developed in other jurisdictions recognizing the heightened justification for disclosure. The first of these has been dubbed the crime-fraud exception which permits discovery of opinion work product created in furtherance of a crime or fraud. The second exception allows discovery of opinion work product when mental impressions are directly at issue as the subject matter of the suit. *See* Edna Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine*, 589–93; 8 Wright, Miller & Marcus, *Federal Practice and Procedure* § 2026 (2d ed., 1994); Jeff A. Anderson, Gena E. Cadieux, George E. Hays, Michael B. Hingerty, Richard J. Kaplan, *The Work Product Doctrine*, 68 Cornell L.Rev. 760, 831–837 (1983); Andrea L. Borgford, *The Protected Status of Opinion Work Product: A Misconduct Exception*, 68 Wash. L.Rev. 881 (1993);

Kathleen Waits, *Opinion Work Product: A Critical Analysis of Current Law and a New Analytical Framework*, 73 Or. L.Rev. 385 (1994). This Court has adopted the crime-fraud exception in syllabus point eight of *State ex rel. Allstate Insurance Company v. Madden*, 215 W.Va. 705, 601 S.E.2d 25 (2004), but has never addressed the applicability of the "directly at issue" exception. Given the conclusion we reach in this opinion, that discussion is left for another day when a more suitable situation allows us to examine the matter fully.

**6.** To aid in defining the meaning and scope of this state's individual civil rules of procedure, this Court often gives substantial weight to federal cases interpreting virtually identical federal rules. *Painter v. Peavy*, 192 W.Va. 189, 192 n. 6, 451 S.E.2d 755, 758 n. 6 (1994).

**7.** These cases were discussed by Chief Justice Davis in her concurring opinion to *Erie I.*

In *Simon,* the Eighth Circuit Court of Appeals had under consideration certified questions arising from a pending products liability action. One of these questions involved whether corporate risk management documents prepared by non-lawyer corporate officials, but revealing aggregate information compiled from individual case reserves numbers determined by lawyers, are subject to protection from discovery as opinion work product. As related in the *Simon* opinion, an attorney set individual case reserves when Searle received notice of a claim or suit with consideration of such factors as an estimate of anticipated legal expenses, settlement value, length of time to resolve the case, and geographic estimates. These reserves figures in turn were used by non-lawyer personnel in Searle's risk management department for a variety of reserves analysis functions.

As a backdrop to its discussion, the court in *Simon* noted that work product protection under the provisions of Rule 26 extends only to documents prepared in anticipation of litigation. The court concluded that even though the risk management documents in the case before it were not prepared in anticipation of litigation, they may still be protected from discovery as opinion work product if the aggregate information disclosed the individual case reserves calculated by Searle's attorneys. The court reasoned that when "individual case reserve figures reveal the mental impressions, thoughts, and conclusions of the attorney in evaluating a legal claim[ ][,b]y their very nature they are prepared in anticipation of litigation and, consequently, they are protected from discovery as opinion work product. *Hickman [v. Taylor],* 329 U.S. at 512, 67 S.Ct. at 394; *In re Murphy,* 560 F.2d 326, 336 (8th Cir.1977)." *Id.* at 401. However, based on the facts before it, the court in *Simon* found that the aggregate reserves document assembled by non-lawyers was not opinion work product because the individual case reserves figures were not readily identifiable in the document. This result was reached because the aggre-

gation was not a direct compilation of the individual claim reserves figures but rather the result of the application of a formula containing a number of other factors. In holding that the work product doctrine did not bar discovery of the aggregate case reserves information contained in the risk management documents before it, the court in *Simon* said: "The purpose of the work product doctrine—that of preventing discovery of a lawyer's mental impressions—is not violated by allowing discovery of documents that incorporate a lawyer's thoughts in, at best, such an indirect and diluted manner." *Id.* at 402.[8]

The federal district court in *Rhone–Poulenc* had occasion to examine reserves information as work-product when presented with a motion to compel by corporate policyholders who were seeking information about an insurer's reinsurance for claims and the reserves set for those claims in underlying "AIDS-related litigation." 139 F.R.D. at 610. Apparently the reserves material sought was all "established based on legal input" and included individual case reserves as well as aggregated reserves information. *Id.* at 614. With respect to individual case reserves information, the court in *Rhone–Poulenc* relied upon the same authorities cited in *Simon* to reach a virtually mirror-image conclusion as the court in *Simon:*

Although these risk management documents being sought by plaintiffs may not have in themselves been prepared in anticipation of litigation, they may be protected from discovery to the extent that they disclose the individual case reserves calculated by defendants' attorneys. The individual case reserves figures reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation, and consequently, they are protected from discovery as opinion work-product. *Hickman v. Taylor,* 329 U.S. 495, 512, 67 S.Ct. 385,

8. While lawyer and non-lawyer generated material was discussed in *Simon,* the conclusion reached by the *Simon* court did not turn on who compiled the materials but whether "the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim" were revealed. 816 F.2d at 401.

394, 91 L.Ed. 451 (1947); *In re Murphy*, 560 F.2d 326, 336 (8th Cir.1977). *Id.* (citations omitted). When such individual case reserves information is used in preparing aggregate reserves information such as risk management documents, the court in *Rhone–Poulenc* deviated from some of the conclusions reached in *Simon* by casting a broader net as to the reserves documents falling within the work product rule's protection by holding:

> [T]he aggregate reserve figures may give some insight into the mental processes of the lawyers in setting specific case reserves. This is inevitable, considering that these aggregates and averages are based upon the attorney's evaluations of the value of specific claims. Notably, this is not a situation where mental impressions are merely contained within and comprise a part of another document and can easily be redacted. Instead, the aggregate and average figures are derived from and necessarily embody the protected material. They could not be formulated without the attorney's initial evaluations of specific legal claims. Thus it is impossible to protect the mental impressions underlying the specific case reserves without also protecting the aggregate figures.

Additionally, the *Rhone–Poulenc* court went a step farther than the *Simon* court by undertaking to dispel any misconception that the aggregate reserves information in the risk management documents should be treated differently because non-lawyers developed the documents. In this regard, the court in *Rhone–Poulenc* stated:

> It can be argued, of course, that while this Court is protecting the mental impression/opinion work product concerning the attorney's evaluation of the reserve necessary for each lawsuit that I should not grant similar protection to any risk management department's opinion work-product concerning an aggregate reserve necessary for the underlying litigation. I find no basis in Rule 26(b)(3) for this distinction. Rule 26(b)(3) requires a court to "protect against disclosure of the mental impressions, conclusions, opinions or [other] legal theories of an attorney *or other*

*representative* of a party concerning the litigation." Thus protective work product is not confined to information or materials gathered or assembled by a lawyer. Instead, it includes materials gathered by any consultant, surety, indemnitor, insurer, agent, or even the party itself. The only question is whether the mental impressions were documented, by either a lawyer or non-lawyer in anticipation of litigation.

139 F.R.D. at 615 (internal citations omitted).

■ In the case now pending, the information sought to be discovered is referred to broadly by the parties as "reserves." It is apparent from the *Simon* and *Rhone–Poulenc* opinions that categorizing reserves materials as individual claim reserves and aggregate reserves is essential to a full examination of the issue raised. To lend clarity to our discussion, the term "individual claim reserves" is defined as reserves set when an insurance claim is made in an individual case, including any updates made to reserves in the individual file as additional information about the claim becomes available. The term "aggregate reserves" or "aggregate reserves document" means a document collecting a variety of individual claim reserves. In either instance, it is apparent from the discussions in *Simon* and *Rhone–Poulenc* that the pivotal issue regarding when reserves information is subject to broader protection from discovery as opinion work product is whether the information is prepared in anticipation of particular litigation.

■ With specific regard to individual claim reserves, the mutual finding of the *Simon* and *Rhone–Poulenc* courts regarding the circumstances under which individual case reserves are considered opinion work product is in line with this Court's general proclamations regarding the work product doctrine as earlier discussed. As a result, we conclude that when individual case reserves information is set by an attorney or by a non-lawyer representative with the primary intent of preparing for litigation, then the individual case reserves information is subject to protection from discovery as opinion work product pursuant to Rule 26(b)(3).

It is equally apparent that aggregate reserves documents compiled for specific litigation by a lawyer or by a non-lawyer representative are prepared in anticipation of litigation and are subject to protection as opinion work product. Accordingly, we hold that for the purposes of Rule 26(b)(3) aggregate reserves documents compiled for specific litigation either by a lawyer or by a non-lawyer representative are opinion work product and merit greater protection from discovery. However, aggregate reserves documents not developed primarily in anticipation of specific litigation but produced for general business purposes are not protected by the work product rule. *See State ex rel. United Hosp. Center, Inc. v. Bedell*, 199 W.Va. 316, 484 S.E.2d 199 (1997). We do not close the door to the possibility that there may be exceptional situations when aggregate reserves documents which include individual reserves information developed for general litigation purposes or for a particular class of cases may be entitled to protection from discovery as opinion work products. Under such unique circumstances, it remains within the sound discretion of the reviewing court to determine if the work product rule is implicated because the thought processes of an attorney or other representative about the case then pending are in jeopardy of disclosure.

Once reserves documents are determined to be opinion work product, the reviewing court treats the material as any other opinion work product. Such materials remain generally protected from disclosure under the provisions of Rule 26(b)(3) unless the party seeking discovery demonstrates to the reviewing court compelling need for the materials, which shall include proof that the opinion materials qualify for a recognized exclusion from application of the work product doctrine.

Although we have adopted these standards regarding reserves information in light of the work product doctrine, we do not find that they have application in the present case. No question is raised in this case regarding Erie's right as an insurer defending a third party bad faith action to resist the discovery of documents it believes to be opinion work product. Syl. Pt. 11, *State ex rel. Allstate Ins. Co. v. Gaughan*, 203 W.Va. 358, 508 S.E.2d 75 (1998). In order to succeed in its effort, Erie bears the burden to adequately demonstrate that the reserves information at issue is indeed opinion work product worthy of protection from discovery. Syl. Pt. 4, *State ex rel. U.S. Fid. & Guar. Co. v. Canady,* 194 W.Va. 431, 460 S.E.2d 677 (1995). As this Court has often stressed, "the work product rule traditionally operates to protect documents prepared *in anticipation of litigation.*" *Gaughan*, 203 W.Va. at 374, 508 S.E.2d at 91. As noted early in our discussion, a document is considered prepared in anticipation of litigation in the context of a work product analysis when the primary motivation for creating the document is "to assist in pending or probable future litigation." Syl. Pt. 7, *State ex rel. United Hosp. Ctr., Inc. v. Bedell*, 199 W.Va. at 320, 484 S.E.2d at 203. This "[d]etermination of whether a document was prepared in anticipation of litigation or in the ordinary course of business is a factual one," which is examined on a case-by-case basis. *Id.* at 328, 484 S.E.2d at 211. In the particular context of an insurer seeking work product protection of documents in an insurance claim file in a third-party bad faith action, we held in *Gaughan* that the factors a reviewing court in such circumstances should consider to determine whether a document was prepared in anticipation of litigation include "the nature of the requested documents, the reason the documents were prepared, the relationship between the preparer of the document and the party seeking its protection from discovery, the relationship between the litigating parties, and any other facts relevant to the issue." Syl. Pt. 12, in part, 203 W.Va. at 362, 508 S.E.2d at 79.

The language of the June 29, 2006, order at issue reveals that the lower court adhered to these principles of law in reaching its conclusion "that the raw data indicating the reserve amounts and the dates said reserve amounts were placed on the claim are not privileged." It is clear from the language of the June 29, 2006 order, that the lower court considered the factors set forth in *Gaughan* to conclude that the reserve

information in the instant case was not prepared in anticipation of litigation:

> The facts of this case indicate that anticipation of litigation is not the primary motivating purpose for establishing insurance reserves, as insurance companies are required by law to establish reserves. Every claim presumably has some reserve amount attached to it, regardless of whether the claim ends in litigation or is resolved through other means. During her deposition on February 16, 2006, claims supervisor Sandra Barker testified that a reserve is "an amount of money or a dollar amount that's set aside for payment of an injury claim or any type of claim of [sic] any payment upon any claim." Mrs. Barker's description of reserves supports the Court's conclusion that the potential for litigation is not the primary motivating purpose for setting reserves, as they are set aside for "any type of claim" and for "any payment upon any claim," not limited to those claims for which litigation is likely or anticipated.[9] (Citation omitted.)

We find no reason in the limited record before us or the arguments presented to conclude that Erie set the reserves in this case for reasons other than the ordinary course of business. The position adopted by this Court in *State ex rel. United Hospital v. Bedell,* is that " 'documents prepared in the regular course of the compiler's business, rather than specifically for litigation, even if it is apparent that a party may soon resort to litigation,' are not protected from discovery as work product." 199 W.Va. at 328, 484 S.E.2d at 211 (citation omitted). Erie maintains in its brief that the reserves information in this case was indeed prepared in anticipation of specific litigation since the reserves are set by the company's claims representatives and embody the mental impressions of those representatives concerning issues of coverage, liability and damages with respect to the specific claim. This assertion hardly addresses the discerning issue of whether the *primary or driving motivation* behind setting the reserves in this case was anticipation of litigation rather than for routine business purposes. Even if, as Erie avers, the claim was referred to its litigation department during the time the reserves were being set, Erie did not prove that the principal reason for setting the reserves was anticipation of litigation. It takes much more than some indicia of concern about possible litigation to establish *primary* motivation. We simply have no basis to find either that the lower court erred as a matter of law or abused its discretion by concluding that the reserve amounts and the dates the amounts were set are subject to discovery in this case. Erie, as the party seeking protection of the reserves documents, has failed to meet its burden of proving that the materials qualify as either fact *or* opinion work product.[10] Consequently, we do not find that the lower court's ultimate disposition of this matter demonstrates an abuse of discretion and thus this Court's intervention through extraordinary relief is not warranted.

## IV. Conclusion

Based upon the foregoing, the extraordinary relief in prohibition requested is denied.

Writ of prohibition denied.

STARCHER, J., concurring.

I concur with the majority's opinion. I write separately, however, to fully explicate the meaning of the majority's opinion.

West Virginia law requires an insurance company, upon receiving notice of a liability claim, to establish a "reserve" for that claim. *See, e.g., W.Va.Code,* 33–7–5 [1957], 33–8–22

---

**9.** According to Ms. Murfitt, Ms. Barker explained during her deposition testimony that it was a matter of company policy that reserves were initially set when a claim was received and every ninety days thereafter.

**10.** As previously noted, Erie also claims that the lower court erred because it required a more relaxed level of proof in its alternative base for granting disclosure. In its second reason for granting discovery, the lower court apparently decided *if* the reserves information was discoverable it was because the material was *fact* work product and applied the more relaxed standard of proof. While this misconstrues the issue of when work product is based on fact or opinion, the conclusion does not warrant further discussion because we have found that the work product doctrine is not applicable under the facts of this case.

[2004]. This means the insurance company must set aside an amount of money equal to the expected amount that will be paid out in the claim—the "loss and loss adjustment expenses" in insurance industry parlance. This ensures that the claim gets paid, and ensures the money isn't spent elsewhere.[1] Insurance companies establish a reserve not only because the law requires it, but also because it is a good accounting practice.

West Virginia law also required an insurance company to "attempt[ ] in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." *W.Va.Code*, 33–11–4(9) [2002].[2] Liability is "reasonably clear" when a reasonable person with knowledge of the relevant facts and law would conclude, for good reason, that the defendant is liable to the plaintiff. Syllabus Point 2, *Jackson v. State Farm Mut. Auto. Ins. Co.*, 215 W.Va. 634, 600 S.E.2d 346 (2004). A "fair and equitable settlement" is a settlement that is made by an insurer impartially, honestly, and free from prejudice, self-interest or other improper influence. Syllabus Point 6, *Hicks ex rel. Saus v. Jones*, 217 W.Va. 107, 617 S.E.2d 457 (2005).

The plaintiff below, Elizabeth Murfitt, was a hotel maid whose wrist was shattered in an October 19, 2000 car wreck caused by a man insured by the defendant, Erie Insurance Property & Casualty Company. Ms. Murfitt incurred over $50,000.00 in medical bills in multiple wrist surgeries, and was totally deprived of her $12,500.00 a year job.

Ms. Murfitt's attorneys contend that Erie knew all along the seriousness and magnitude of Ms. Murfitt's injuries, and knew liability was clear. However, because she was "an unsophisticated woman, with no income," the plaintiff's attorneys contend that Erie made "low ball" settlement offers—starting at $47,000.00—and then dragged the case out for over two years. As proof, the plaintiff's attorneys note that the amount of Erie's settlement offers jumped by a factor of ten in the days before trial, and that the case was finally settled on the second day of trial in November 2002 for seventeen times Erie's original offer.[3]

At some point after Ms. Murfitt made a claim to Erie, it appears that Erie did what it was supposed to do by law and by practice, and established a reserve.

Ms. Murfitt is now suing Erie for bad faith, and wants Erie to produce evidence of the reserve value Erie placed on her claim at the time Erie was making its lowball offers. Erie, however, claims that the reserve value number is attorney work product protected from discovery. This is nonsense.

First, the reserve value was a number created by Erie because of the law, not because Ms. Murfitt was threatening litigation. The West Virginia Insurance Commissioner, as well as the commissioner of probably every other state in which Erie does business, has the right to inspect Erie's books to ensure that sufficient money is being kept in reserve to pay pending claims. *See W.Va. Code*, 33–2–9 [2006]. The only way for the Insurance Commissioner to know if the amount reserved is truly sufficient to pay the

---

1. Some insurance companies spend policyholder premiums on activities other than claims. During the liquidation of a medical malpractice insurer in 1997, it was revealed that company money had been spent on such things as buying cattle, paying casino debts, for contributions to political parties, to remodel the Republican state headquarters, for luxury baseball skybox seats, for loans to company board members that were forgiven and never repaid, for rare paintings and for buying a retirement complex. *See Verba v. Ghaphery*, 210 W.Va. 30, 39–40, 552 S.E.2d 406, 415–16 (2001) (Starcher, J., dissenting).

2. Unfortunately, in 2005 the Legislature replaced third-party causes of action for violations of the Unfair Trade Practices Act—lawsuits like the in-

stant case—with a purely administrative remedy. *See W.Va.Code*, 33–11–4a [2005]. Fortunately, for now, first-party insureds continue to retain the right to pursue damages in court when an insurance company violates the Act and refuses to negotiate with its own customers fairly and in good faith.

3. From several months after the accident until the weeks before the trial, Erie's highest offer was $55,000.00. Three weeks before trial, Erie's settlement offer jumped to $275,000.00, and jumped to $500,000.00 three days before trial. Erie offered $600,000.00 at the trial's beginning, and settled on the second day of trial for $800,-000.00—nearly sixteen times the amount of the offer Erie insisted was fair for two years.

claim is to look at precisely the same evidence the plaintiff is seeking in this case.

Second, the reserve value in Ms. Murfitt's case should have been derived from the facts behind Ms. Murfitt's wreck and her injuries and economic losses. These facts are all discoverable. It is bewildering then when an insurance company assembles these facts in one place to calculate a monetary value—but then says that the entire assemblage of facts is privileged and undiscoverable.

Third, insurance reserves are established to resolve claims. Paying claims is what insurance companies are supposed to do, and the value of most claims should be fairly resolved through negotiation rather than litigation. This means that the primary purpose of an insurance reserve has nothing to do with litigation, and everything to do with prompt, fair, and equitable settlement of claims in which liability has become reasonably clear. Litigation is supposed to be the exception, not the rule. And if an insurance company prepares every claim with the goal of taking the claim into litigation, I think it is fair to say that the insurance company, as a general business practice, is failing to fairly settle claims and is instead breaking the law by "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered[.]" *W.Va. Code*, 33–11–4(9)(g).

Simply put, in most cases I believe that the documents created in the establishment of a reserve are nothing more than routine business records, not opinion work product created in response to litigation. The primary motivating purpose behind the creation of an insurance reserve is to comply with state law, and to comply with good insurance accounting procedures. These documents are therefore fully discoverable.

This case has been dragging on for nearly seven years. The insurance company delayed making a fair offer to settle the plaintiff's lawsuit until the trial began. Now, when the insurance company's actions are under the microscope, the company has tried to squirm out of producing documents in discovery. When the circuit court has ordered the production of the documents, the insurance company has twice run to this Court asking for a "do-over" in the form of writs of prohibition.

This Court correctly supported the circuit court's order requiring Erie to produce the documents pertaining to the creation of a reserve in Ms. Murfitt's case.

I therefore respectfully concur.

BENJAMIN, Justice, concurring.

The nature of the instant litigation coupled with the trial court's detailed findings and narrow ruling regarding reserve information at issue herein underscores the propriety of the denial of the requested writ of prohibition. The basis of Ms. Murfitt's claim against Erie Insurance Property & Casualty Company (hereinafter "Erie") is that Erie violated West Virginia law by failing to make a good faith attempt to settle her claim against an Erie insured arising from an automobile accident in which she sustained significant injuries. West Virginia law imposes a duty upon insurers doing business in this state to attempt "in good faith to effectuate a prompt, fair and equitable settlement[ ] of claims in which liability has become reasonably clear." W. Va.Code § 33–11–4(9)(f) (2002). Additionally, our law prohibits an insurer from refusing to pay a claim "without conducting a reasonable investigation based upon all available information." W. Va.Code § 33–11–4(9)(d). At the time of the actions at issue herein, our law likewise provided that a third-party, such as Ms. Murfitt, could assert a private cause of action directly against an insurer who failed to comply with mandates of our Unfair Trade Practices Act, W. Va.Code § 33–11–1, *et seq.*

After settling her claim against Erie's insured on the second day of trial for substantially more than any Erie pre-trial settlement offer, Ms. Murfitt amended her complaint to assert a bad faith cause of action directly against Erie arising from its conduct in handling her claim. The primary issues to be resolved in this direct action against Erie are, therefore, what Erie knew about Ms. Murfitt's claim, when Erie knew it and whether Erie attempted, in good faith, to effectuate a fair and equitable settlement in

light of the information available to it at the time any particular settlement offer was made. From the limited record before this Court, it appears Erie consistently offered to settle Ms. Murfitt's claim for less than her incurred medical bills and without regard for her lost wages for nearly two years prior to the commencement of the trial of the underlying personal injury action. Then, within the month before the personal injury trial was to commence, Erie's settlement offer increased exponentially without any objective evidence of newly discovered facts justifying such a dramatic increase. Ultimately, Erie offered to settle Ms. Murfitt's claim for $800,000 on the second day of trial, an offer nearly sixteen times greater than Erie's average settlement offer for the two years prior to trial.

A fundamental prosecution theory for a failure to offer reasonable settlement claim is that the insurer indeed valued the claim much higher than its settlement offers indicated. Thus, the critical evidence necessary to succeed on such a claim is how the insurer valued the claim at the time the settlement offers were made. Where, as here, the insurer admits that its reserves for a particular claim are fact-dependant, i.e., set in light of the information available regarding a particular claim, the reserve amount is directly relevant and constitutes primary evidence of whether the insurer attempted, in bad faith, to settle a claim for substantially less than the amount it deemed reasonable and equitable compensation for the injuries sustained.

As few jurisdictions recognize common-law third party bad faith actions, most discussion regarding the ability to discover reserve information has occurred in the context of first party bad faith claims where the basis of the claim is a denial of coverage, failure to settle and/or failure to defend. In those contexts, several courts have recently found reserve information to be both relevant and discoverable because it demonstrates the propriety of the insurer's actions. *See, Oak Lane Printing & Letter Service v. Atlantic Mut. Ins. Co.* 2007 WL 1725201, *4 (E.D.Pa. June 13, 2007) ("For instance, reserve information is relevant to a bad faith claim where the insurer fails to settle or where there is a disputed issue regarding the value of the claim."); *United States Fire Ins. Co. v. Bunge North America, Inc.,* 2007 WL 1531846, *9 (D.Kan. May 25, 2007) ("the information sought may demonstrate the extent to which the Insurers investigated and considered Bunge's claim, and thus is relevant to the question of good or bad faith in failing to indemnify or defend Bunge."); *Athridge v. Aetna Cas. & Sur. Co.,* 184 F.R.D. 181, 192 (D.D.C.1998) (evidence of settlement reserve is relevant in action for breach of fiduciary duty to insured or insured's assignee because information will aid in demonstrating thoroughness with which claim was investigated).

The United States District Court for the Northern District of California recently discussed the relevancy of reserve information to claims of bad faith in a first-party context in *Bernstein v. Travelers Insurance Company,* 447 F.Supp.2d 1100 (N.D.Cal.2006). Although the claim at issue in *Bernstein,* involved the insurer's alleged knowing refusal to release payments to its insureds,[1] the circumstances therein are analogous to the issue presented herein, the failure to make reasonable settlement offers. Discussing the

---

1. According to the court in *Bernstein,*

> Central to plaintiffs' theory of the case is that Travelers repeatedly and knowingly refused to release payments that it knew it owed on the claims, and that Travelers' business strategy over at least the first 20 months of the claims processing period was to make unjustifiable demands for proof of claims, to unjustifiably delay making payments, and then to pay less than it actually believed it owed, all in order to soften Bernstein up for a settlement offer that Travelers knew was appreciably smaller than the real value of plaintiffs' claims.

*Bernstein,* 447 F.Supp.2d at 1108. While I recognize that an insurer owes a higher duty to its own insured than to a third-party claimant, the reasoning utilized by the court in *Bernstein* is persuasive to me due to the similarity of the theory asserted therein (refusing to make payments knowingly owed to an insured) to that asserted in the instant matter (making unreasonably low settlement offers knowing the claim had a much higher value). The relevance and persuasive nature of the *Bernstein* analysis is further demonstrated by the court's recognition therein that "there is a closer apparent proximity between the amount of a reserve and the coverage issue in a third party action (alleging bad faith in declining to fund an insured's defense) than in a first party case." *Id.* at 1105.

relevance of reserve information to the claims asserted, the court stated:

> In assessing the "discovery relevance" of the targeted information, we must consider all the litigation purposes for which plaintiffs might use it—as direct evidence on a disputed issue, as grounds for challenging or testing positions taken during the litigation by the defendants, or as means to help develop evidence that could be used, directly or circumstantially, to litigate more reliably the principal issues in the case.

*Bernstein,* 447 F.Supp.2d at 1105–06 (footnote omitted). With respect to a bad faith action, the court noted that reserve information may be relevant to " 'the question of whether ... the insurer had conducted a proper investigation or given reasonable consideration to all of the factors involved in a specific case[.]' " *Id.* at 1107, quoting, *Lipton v. Superior Court,* 48 Cal.App.4th 1599, 1614, 56 Cal.Rptr.2d 341 (1996). Explaining the relationship between reserve information and the bad faith claims asserted, the court recognized that:

> [c]ritical to [the] theory of the case is a posited self-conscious disconnect (a large, unbridgeable gap) between, on the one hand, what Travelers was communicating to, demanding of, and paying its insured and, on the other hand, what Travelers actually thought it owed and would owe under the claims. Under this theory, what Travelers' "internal assessment of the subject claim" actually was at various junctures is the critical factual issue in the litigation.
>
> Plaintiffs assert that discovery of the reserves that Travelers set aside, and of internal documents, comments and communications related to those reserves, will enable plaintiffs to uncover and prove what Travelers "internal assessments" really were—and thus to demonstrate that there were big, inexplicable differences between what Travelers communicated to and demanded of plaintiffs and what Travelers really understood about both coverage and

valuation issues.... Without the materials sought through this discovery, plaintiffs and the court would be more dependent on oral testimony from Travelers' agents about what they really thought about the claims as they were being processed—and thus more vulnerable to good faith errors of memory or to deception.

*Id.* at 1108–09, 56 Cal.Rptr.2d 341 (footnote omitted). Similarly, the critical issue in this matter is whether Erie's pre-trial settlement offers were reasonably related to what Erie actually thought it owed on Ms. Murfitt's claim. Considered discovery of the reserve dates and amounts constitute the best objective evidence of how Erie valued Ms. Murfitt's claim in light of Erie's admission that the reserves were set in light of the facts known to Erie without necessitating inquiry into the internal thought processes of Erie's agents.

By permitting the discovery of the dates and amounts of reserves, the reasonableness of Erie's settlement offers may be determined. If the reserves are vastly greater than the settlement offers made, such fact may show that Erie violated West Virginia law by attempting, in bad faith, to settle Ms. Murfitt's claim for far less than Erie reasonably believed its value to be. By contrast, if the reserves were reasonably related to the settlement offers made, the same could be used as a defense by Erie to demonstrate that it made a good faith attempt to settle Ms. Murfitt's claim for an amount it deemed reasonable in light of all facts known.[2]

In light of the record presented herein, this Court properly denied Erie's requested writ of prohibition. The trial court's order is appropriately narrow and protects against the discovery of the thought processes underlying the establishment of Erie's reserves in that is provides only for the date a particular reserve was established and its amount. By permitting discovery of the reserve amounts and dates, the trial court's order permits Ms. Murfitt access to evidence critical to the prosecution of her claim, evidence

---

**2.** When faced with a claim that it violated West Virginia law by failing to make reasonable settlement offers, I have little doubt that an insurer would be eager to disclose its reserve information

tion where the same is reasonably related to its settlement offers because such a relation could serve as a defense to the bad faith allegations.

existing only in the possession of Erie. It would be difficult, if not impossible, to prove a claim that an insurer offered unreasonably low and inequitable settlement amounts in light of the value the insurer placed on a claim without access to evidence indicating how the insurer actually valued the claim. By allowing Ms. Murfitt to discover reserve amounts and dates, the trial court's order properly gives Ms. Murfitt access to critical information for which she has a substantial need and which she could not otherwise obtain. Accordingly, I concur in the denial of the requested writ of prohibition.